Comstock, Ch. J.,
delivered the opimon of the court:
The objection that the testator was incompetent to make a will, being wholly unsustained by the proof, was abandoned *11 on the argument in this court. It was urged, however, that the execution of the instrument was procured by fraud and undue influence, and this point will be first examined. It appears that the testator, although an aged man, and doubtless somewhat enfeebled in his faculties, lived nearly three years after the will was made, and attended to such affairs as he had to transact. • At the date of the will, he was in the enjoyment of his usual health. The transaction was kept a secret from his wife, and from the'domestics belonging to his household. They were absent from his house on the day of the execution, but their absence and the secresy of the act appear to have been contrived by himself, 'without a suggestion from any other quarter. He sent for his nephew, Alexander H. Coffin, who resided some three miles distant, and with whom, it seems, he had a previous understanding in regard to drawing the will, when the circumstances were considered favorable to such a purpose. Alexander H. Coffin had prepared himself with a book of forms, and when sent for he went to the testator’s house, drew the will and attended to the formalities of execution. The attesting -witnesses were two persons engaged in doing some mechanical work for the testator, and whose presence on that day, so far as we know, was procured by himself. In' all these circumstances we see no evidence of coercion or fraud, or even of persuasion, which influenced the mind or conduct of the testator. On the contrary, they show very clearly that his acts were prompted by motives entirely his own. Secresy' and contrivance may undoubtedly be badges of fraud in the execution as' well of wills as of other instruments; but when the circumstances of that character can be clearly traced to the mind or wishes of the testator himself, they cannot be received as having any tendency to impeach his testamentary dispositions.
We have been referred to the will itself as directing an unusual, if not an unnatural, distribution of the estate of the decedent, and as evincing the presence of some undue and fraudulent influence upon his mind. His property was worth about $55,500. It consisted of the farm on which he lived, valued at $28,000of personal estate upon it, worth $3,500; and of *12 bonds, mortgages, and other assets, estimated at $24,000. His collateral kindred were a sister, Mrs. Eider, and ten nephews and nieces, the children of his brother. By his will he gave to his wife, absolutely, the sum of $6,000, and one-half his furniture, in lieu of dower. To his son he devised the farm. He gave him also the personal estate situated thereon, the other half of the furniture, and $7,000 in money. The value of this devise and of these bequests to the son was $38,500. The estate given to him was, however, to remain under the control of the executors until he should become of age; and, in case he should die before that time, or without issue, it was subject to a limitation-over in favor of his sistef and his nephews and nieces. To his sister the testator bequeathed the sum of $3,000; and the residue of his estate he gave to his nephews and nieces, the children of his brother, according to certain proportions specified. The amount of the residuum would be about $8,000. A. H. Coffin, who drew the will and was appointed one of the three executors, was one of the nephews, and the legacy given to him was $400—the like sum being also given to several of his brothers and sisters.
In this plan of distribution and limitation, we see nothing so eccentric or extraordinary as to justify an inference that it was not in harmony with the testator’s own well-considered wishes and intentions. His wife was so much younger than himself that he must have married her at an advanced period of his life, and she probably had not participated in the toils and cares which led to the accumulation of his estate. We are not informed of the particulars of their domestic life; but that confidence and affection on his part were attended with some reserve, is evident from the circumstance that he did not wish her to be acquainted with the execution or contents of his will. He gave to her, absolutely, a sum, the income of which would be quite sufficient for her support. Having done this, we can imagine the existence of motives, not at all unreasonable, which induced him to prefer his own kindred to her, or her kindred, in the further dispositions of his estate. He recognized the claims of a sister in the legacy which he gave to her, and also *13 of Ms brother’s children to a very moderate extent, after making the most ample provision for his son. The contingent limitation of the son’s share in favor of his sister and nephews and Meces, simply exhibits a preference which we cannot pronounce an unnatural one. And inasmuch as we find nothing in the will which cannot be accounted for according to sentiments and affections known to exist in common life, and wMch often influence men in their testamentary acts, so we have no right to infer, without other proof, that, in making such a will, the testator’s own mind was not fully and freely expressed.
The circumstance, that the nephew who prepared the will was appointed one of the executors and is also a legatee, has been urged upon our consideration. Facts of this kind may, and do often, very justly excite the suspicion of courts, when fraud and undue influence are alleged. But it is not a rule or principle in the law of testaments that the draftsman of a will cannot be an executor, or cannot take a benefit under it. As men qmte generally appoint some of their kindred to be their executors, the choice in the instance before us does not seem to be an unnatural one. Indeed, there would be some difficulty in suggesting a different choice, in the actual circumstances and relations of the testator. His son was an infant, and his wife does not appear to have been the object of Ms testamentary regard, except in the pecumary provision which has been mentioned. To give her, moreover, the control of the son’s estate, during his minority, would not be qMte consistent with the motives wMch dictated the ulterior limitation in favor of Ms own kindred. In respect to the legacy or portion given to A. H. Coffin, the draftsman of this will, we find it so moderate in amount, and in such just proportion to the sums given to the nine other persons standing in the same relation to the testator, as to afford no ground for invalidating the instrument or any part of it. As I have observed, there is no rule of law which prevents a person who prepares a will from taMng a legacy under it. In the language of Baron Parke, in Butlin v. Barry (1 Curteis’ Ecc. R., 637): “ All that can be truly said is, that if a person, whether an attorney or not, prepare a will *14 with a legacy to himself, it is, at most, a suspicious circumstance, of more or less weight according to the facts of each particular case, in some of no weight at all, as in the case suggested, varying according to circumstances, for instance the quantum of the legacy, the proportion it bears to the property disposed of, and numerous other contingencies.”
Having come, therefore, to the conclusion that the will cannot be impeached on the ground of fraud in procuring its execution, the next inquiry is, whether it was published and attested with the requisite legal formalities. The evidence on this point is that of the two attesting witnesses and of the draftsman, Mr. Cofín. According to the testimony of the latter, there can be no doubt. He has sworn to all (the particulars of execution, publication and attestation which the statute requires. His statement, however, differs considerably from that of the two attesting witnesses; and the Surrogate, in deciding against the will, seems to have discredited his account of the transaction in the circumstances where it differed from, theirs. We have not the advantage of seeing and hearing the witnesses. As the case appears to us, without their actual presence, we should certainly incline to think the evidence of Mr. Coffin to be altogether the most reliable. That he had much greater intelligence in regard to a subject of this nature, cannot be doubted. Indeed, we have every reason to conclude that he had, before preparing this will, made himself fully acquainted with the formalities which the law required. From his situation and relation to the transaction, his attention must have been given to all the particulars; and his evidence is direct and positive. On the other hand, the subscribing witnesses were called to the presence of the testator for the purpose of attestation only; and their failure to state all the facts to which the other witness deposed may not unreasonably be referred to their want of attention or of memory. They were called to testify some three years after the fact; and it is not at all singular that they should have lost the recollection of some of the circumstances. Such would be our impressions, if the hearing were now an original one; but we prefer to place *15 the decision we make more distinctly on the ground that the will is valid according to the evidence of the attesting witnesses alone.
First, as to the publication. The statute requires that the testator, when he subscribes a will, or acknowledges its execution to the witnesses, shall declare the instrument to be his last will and testament. (2 R. S., 63.) But this declaration need not be in any particular form. Any communication of the testator to the witnesses, whereby he makes known to them that he intends the instrument to take effect as his will, will satisfy the requirement. (Lewis v. Lewis, 1 Kern., 226; Brinkerhoff v. Remsen, 8 Paige, 488; S. C., 26 Wend., 325.) In the case before us, according to the evidence of the two attesting witnesses, one of them asked the testator if he wished him to sign or witness the paper as his will; to which the testator answered in the affirmative. As both the witnesses were present, this was a good publication as to both of them, if good as to either. We think it was sufficient, because it was in substance a communication that the paper was the will of the testator. There can be no doubt that such a declaration can be made in answer to a question, or even by a sign. It is only required that it be understandingly made, and this we have no reason to question in the present case. All the circumstances surrounding and attending the transaction demonstrate that the testator perfectly understood the nature of the act he was performing.
In the next place, as to the attestation. The statute requires two witnesses, each of whom must sign his name at the end of the will, at the request of the testator. Confining ourselves to the evidence of these two witnesses, the facts appear to be these: They were present at the testator’s house on the day in-question, by his own procurement, and for the purpose, as there is reason to believe, of witnessing his will. When the instrument was ready for execution and attestation, they were summoned to the room where the matter was- transacted. They came there, saw the testator subscribe his name, and signed their names as witnesses. Before doing so, one of them asked *16 the testator if he requested him to sign the will as a witness.; to which he answered in the affirmative. Both the witnesses then proceeded to sign; the draftsman denoting the place where their names were to be written. ' The testator, the draftsman •and the witnesses were all at one table, and in dose proximity to each other. The request to attest the will was in answer to the question thus put by one of the witnesses, and no other or different communication was made to the other. Taking this as substantially the true statement of the facts, the objection which has been urged is, that one of the witnesses attested the instrument without any request made by the testator. Now, the statute, it is true, declares that each witness must sign on such request. But the manner and form in which the request must be made, and the evidence by which it must be proved, are not prescribed. We apprehend it is clear that no precise form of words, addressed to each of the witnesses at the very time of the attestation, is required. Any commu nication importing such request, addressed to one of the witnesses in the presence of the other, and which, by a just construction of all the circumstances, is intended for both, is, we think, sufficient. In this case both the witnesses, by the direction or with the knowledge of the testator, were summoned to attend him for the purpose of witnessing his will. They came into his presence accordingly, and, in answer to the inquiry of one of them, in which the singular instead of a plural pronoun was used, he desired the attestation to be made. In thus requiring both the witnesses to be present, and in thus answering -the interrogatory addressed to him by one of them, we think that he did, in effect, request them both to become the subscribing witnesses to the instrument. Any other interpretation of his language, and of the attending circumstances, would be altogether too narrow and precise.
Another point urged upon the argument deserves a brief consideration. The statute, in separate and independent clauses, besides the subscription of the testator, requires that he shall declare the instrument to be his will, and shall request the witnesses to sign it. In this case the publication, and the *17 request that the witnesses should sign it as such, are both included in the testator’s answer, when asked whether he wished to have the paper attested as his will. But this objection, we think, is not fatal. All that the statute requires is, that the act of publication, and the act of requesting the witnesses to sign, shall both be performed. These acts are distinct in their nature or quality, but their performance may be joint or connected. If a testator should say to the witnesses, “ I desire you to attest this instrument as my last will and testament,” the language would import, not only a request, but a clear publication of the will. This point has been so held by Mr. Bradford, the late learned Surrogate of Hew York, and for reasons entirely satisfactory. (3 Bradf., 353.)
On the whole, we are of opinion that the judgment of the Supreme Court and the sentence of the Surrogate must both be reversed, without costs of the litigation to either party, and the proceedings remitted to the Surrogate, with a direction to admit the will to probate.
Lott, J., took no part in the decision; all the other judges concurring,
Ordered accordingly.